IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WP 851 ASSOCIATES, L.P., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 07-2374 |
| | : | |
| v. | : | |
| | : | |
| WACHOVIA BANK, N.A. | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM AND ORDER**

**Jones, J.**                                                                          **February 26, 2009**

Defendant Wachovia Bank, N.A. ("Wachovia") moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the remaining claims asserted by Plaintiff WP 851 Associates, L.P. ("WP 851") – namely, Count I (breach of contract) and Count III (promissory estoppel). Because there is insufficient disputed record evidence that an oral agreement to lease existed between the parties, summary judgment is appropriate.

**I.       Procedural History**

This straightforward dispute concerns an unconsummated lease for certain commercial property. WP 851 sued Wachovia alleging (1) breach of contract, (2) fraud, (3) promissory estoppel and (4) breach of the duty to negotiate in good faith. In an Order dated January 10, 2008, the Hon. Gene E.K. Pratter dismissed the fraud and breach of the duty to negotiate in good faith claims, but allowed the breach of contract and promissory estoppel claims to proceed.[1] Plaintiff moved to re-assert Count IV of the Complaint (breach of duty to negotiate in good faith), and this Court denied that motion in an Order dated January 8, 2009. Now pending is

---

[1] This case was transferred to the docket of this Court on November 17, 2008.

Defendant's Motion for Summary Judgment (Docket No. 30).

## II.    Legal Standard

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c).  In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23.  An issue is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. Anderson, 477 U.S. at 248.  In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." Seigel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.    Facts

The Court finds that there are no disputes of material fact in this case.  The  undisputed facts are as follows.

WP 851 is a Pennsylvania limited partnership formed in 2005 for the purpose of

acquiring the property that is at issue in this case (located at 851 Lancaster Avenue, Devon, Pennsylvania) (the "Property"), and the Property was acquired in 2005.  Hess Dep. at 15, 19.  WP 851 acquired the property for the purpose of developing commercial retail space known as the Shoppes at Devon.  Complaint ¶ 3.  WP 851 hired Dan Zelson from Charter Realty as its leasing broker for the Property.  Hess Dep. at 20.  Wachovia is a national banking association with thousands of branches throughout the United States.  Complaint at ¶ 2.

In early 2006, Wachovia and WP 851 began discussion about WP 851 leasing to Wachovia a pad site on which Wachovia would build a bank branch with drive through lanes. Zelson Dep. at  28.  Initially, the parties discussed locating the pad site and drive through lanes within the parameters of the Property, but when Wachovia determined that its configuration for the branch with drive through lanes would not fit within the parameters of the Property, the parties then looked into the possibility of WP 851 gaining control of the property located in front of the Property on which a Leslie Pool store was located.  McDevitt Dep. at 28; Rosenberg Dep. at 34.  WP 851 attempted to purchase the Leslie Pool property but was unsuccessful.Rosenberg Dep. at 34.

The next option considered by Wachovia and WP 851 was for WP 851 to gain control over the property located to the west of the Property on Lancaster Avenue (the "Donato Property").  McDevitt Dep. at 48-49; Hess Dep. at 37-38.  WP 851 began negotiations with the owners of the Donato Property in November 2006 to ground lease the property.  Def's Summ. Judg. Mot. Exh. 5 (November 28, 2006 Letter of Intent from Bryan Weingarten to Robert Donato).  On November 28, 2006, WP 851 executed a letter of intent for the Donato Property in anticipation of negotiating and executing a 20 year ground lease.  Id.  WP 851 and the owners of

the Donato Property then undertook to negotiate a lease agreement.  Barkhouse Dep. at 8-21.

WP 851 was unable to obtain the necessary signatures of all the owners of the

Donato property and there is no evidence in the record to suggest that WP 851 ever could have

obtained control over the Donato property and delivered it to Wachovia to build the pad site.

Id. at 18-21.  WP 851 never executed a lease for the Donato Property.  Id. at 49; Barkhouse Dep.

at 16-17.

   After WP 851 had already executed the letter of intent for the Donato Property, it

moved forward with more serious negotiations with Wachovia which culminated in Wachovia

sending WP 851 a seven page letter of intent dated January 12, 2007 (the "LOI").  Def's Summ.

Judg. Mot. Exh. 7.  While the LOI identified some terms such as location (albeit incorrectly), rent

($315,000), and term (20 years with renewals), it did not address other material terms such as the

date on which rent would commence, default remedies, and build and open covenants.  Id.  The

LOI set forth Wachovia's express limitation of its intent to be bound by any preliminary

negotiations with WP 851.  Id.  According to the LOI, Wachovia would not be bound until a

mutually satisfactory lease was fully executed and delivered to all parties.  Id.  According to the

LOI, Wachovia would not enter a lease agreement absent approval of the terms by its real estate

committee.  Id.[2]  At no time after sending the LOI did Wachovia represent to WP 851 that it had

---

    [2]  The LOI expressly stated the following:
• "[This letter] is not intended to be contractual in nature, but only to express the basis upon which we wish to negotiate to enter a lease with respect to the Premises."
• "The undersigned acknowledge that this letter is intended to outline initial terms for consideration only, and is (sic) not intended to obligate any party contractually."
• "No such obligation shall arise from this letter and any resulting Lease drafts unless and until a mutually-satisfactory Lease is fully executed by, and delivered to, all parties."
• "Subject to Tenant's real estate committee's review and approval, and a mutually agreed upon Lease, (sic) Tenant is willing to proceed under the following terms and conditions."

obtained the approval of its real estate committee to enter a lease with WP 851.  Hess Dep. at 86.

Under the unsigned LOI, Wachovia did not have an obligation to negotiate in good faith and only

with WP 851.  Id.  Wachovia never represented to WP 851 that it was negotiating exclusively

with it.  Zelson Dep. at 46-47; Barkhouse Dep. at 29.  The LOI was never signed by either WP

851 or Wachovia.  Pl's Dismissal Opp. Brief at 10.  WP 851 concedes the LOI was not intended

to be a binding contract.  Hess. Dep. at 50.

On January 22, 2007, Mr. Zelson sent an email in which he referenced a "deal" (the "1/22

Zelson Email").  Def's Summ. Judg. Mot., Exh. 8.  Wachovia responded that it would prepare

the paperwork to memorialize the "deal."  Id.  Mr. Zelson testified at his deposition that the

"deal" to which he referred in the 1/22 email was the LOI.  Zelson Dep. at 48-49.

> Q: If you would turn please to the second page which
> appears to be an email from you which is dated on January
> 22, 2007 at 9:30 a.m. from you to Bob McDevitt and it
> reads, "Now that we have a deal, are we doing the lease or
> you?" Did I read that accurately?
>
> A: Yes.
>
> Q: What did you mean when you said "now that we have a
> deal."
>
> A: That we have a meeting of the minds on all of the terms I
> guess reflected in this letter of January 12, 2007.
>
> Q: So your use of the word "deal" here, does that – you're
> referencing the letter of intent?
>
> A: Yes.
>
> Q: So once you – I'm just trying to understand what
> happened here. So once you received what's been marked as
> Exhibit D-2 [the LOI], it was your understanding that the
> parties had a deal?

A: Correct.

Q: Did you have any subsequent conversations with Mr. Ortlieb or anybody at Wachovia between January 12th, the date of [the LOI] and January 22nd, the date of your email?

A: I'm sure we had several conversations.

Q: Do you recall any of them?

A: I can't recall the actual conversations themselves, but what we would have done or what we did, was talk though this letter of intent, make sure we understand each other and then subsequently this email went out on the 22nd was to confirm that we had an understanding.

Q: And was the understanding based solely on the letter of intent or was it based on the intervening communications?

A: I would say the majority of it was based on the letter of intent. Obviously we were talking about a different location and that was communicated in our phone conversations and subsequently, I believe, in the lease that was drafted – but confirming the major business deal were in this letter of intent.

Q: Other than the location, was anything else changed or discussed as being different during your intervening phone calls between January 12th and January 22nd, and by different, I mean different from the letter of intent?

A: I don't recall so.

Q: Just so I'm clear, you don't think there were or you just don't recall if there were?

A: I don't think there were any changes.

Zelson Dep. at 48-50.

On February 20, 2007, WP 851 sent a draft lease agreement to Wachovia via email.

6

Complaint at Exh. D.  The email provided:  "Please note that submission of the attached does not constitute an offer of lease, and Landlord will not be bound to the terms and conditions of the proposed Lease unless and until the Lease has been executed and delivered by both Landlord and Tenant. Additionally, the Lease remains subject to the review and comment of our development/construction departments and insurance broker."  February 20, 2007 email from Cris Backhouse to Elaine Moranz with attached Second Draft Lease, Def's Summ. Judg. Mot at Exh. 11.

     After sending the Second Draft Lease, Wachovia and WP 851 exchanged two more drafts of a lease agreement (the "Third Draft Lease" was sent by Wachovia to WP 851 on March 16, 2007 and the "Fourth Draft Lease" was sent by WP 851 to Wachovia on April 4, 2007).  Complaint at ¶¶ 19, 43.  The Fourth Draft Lease included numerous provisions not included in any prior drafts and never before discussed by the parties.  McDevitt Dep. at 88-97. The issues created by these new provisions were material and unacceptable to Wachovia.  Id. at 88-91.  Thereafter, Wachovia ceased negotiations with WP 851.  Id. at 88-104.  Wachovia directed its broker on or about April 16, 2007 to notify WP 851 that Wachovia had been presented with another opportunity and was investigating it.  Id. at 99.  On or about April 24, 2007, Wachovia directed its broker to notify WP 851 that it intended to pursue the alternative site.  Id. at 99.  Over those two weeks, Wachovia's broker attempted to contact Mr. Zelson and left numerous messages, but did not actually speak with him.  Id. at 99; Ortlieb Dep. at 42. When Mr. McDevitt realized that the broker had not spoken to Mr. Zelson, he contacted Mort O'Boyle of WP Realty and informed him that Wachovia was no longer willing to negotiate a lease with WP 851 and was instead going with a different location.  McDevitt Dep. at 104.

IV.    **Discussion**

A.    **Breach of Contract Claim**

A breach of contract claim requires WP 851 to show a contract between the parties, the essential terms of the contract, a breach of a duty under the contract, and damages resulting from that breach. Electron Energy Corp. v. Short, 597 A.2d 175 (Pa. Super. 1991), aff'd 618 A.2d 395 (Pa. 1993). The Court agrees with Defendant that Plaintiff's claim fails at the very first step because the undisputed record evidence shows that the parties had no contract. As a threshold matter, according to the undisputed facts, no written, signed lease agreement existed between WP 851 and Wachovia (indeed, the LOI was expressly non-binding). Rather, the "agreement" that WP 851 purports existed is an unspecified oral contract allegedly entered into by its broker, Mr. Zelson, and either Mr. McDevitt or Mr. Ortlieb from Wachovia at a non-specific point in time between January 12, 2007 and January 22, 2007.

The only record evidence that WP 851 can point to in support of the existence of this agreement is the reference to a "deal" in the January 22, 2007 Zelson E-Mail and Wachovia's non-specific response thereto.[3] However, as highlighted above, Mr. Zelson testified at his deposition that the reference to a "deal" in the January 22, 2007 Email was to the LOI. Zelson Dep. at 48-49. None of WP 851's representatives have given evidence that there was a separate oral agreement that was being referenced in the 1/22 Zelson email. Although Mr. Zelson

---

[3] Plaintiff attempts to "create" a contract because Wachovia did not proactively "rebut" Zelson's use of the term "deal" by sending him and email or calling him to "correct his statement." However, Mr. McDevitt testified that he did not feel any reason to because he viewed Zelson's use of the term "deal" as an "overzealous representation by the landlord's broker to elicit an emotional commitment for the purposes of leverage. The term "deal" is informal nomenclature..." McDevitt Dep. at 68-69.

indicated he thought there may have been some telephone conversations with Mr. McDevitt and Wachovia's broker between January 12, 2007 and January 22, 2007, he could not recall the specifics of those conversations and indeed he did not testify that one or all of those conversations resulted in a separate oral agreement.  Id. at 49-50.

On top of Mr. Zelson's candid testimony, any hint of a separate oral agreement is belied by the February 20, 2007 email from WP 851 forwarding the Second Draft Lease, which expressly disclaimed an agreement:  "Please note that submission of the attached does not constitute an offer of lease, and Landlord will not be bound to the terms and conditions of the proposed Lease unless and until the Lease has been executed and delivered by both Landlord and Tenant."  Def's Summ. Judg. Mot. at Exh. 11 (emphasis added).  Accordingly, as of February 20, 2007, WP 851 knew that no oral lease agreement existed and that it was still in the middle of negotiating a binding lease with Wachovia.  No record evidence from any other WP 851 witness suggests the existence of a separate oral agreement.[4]

Accordingly, Defendant is entitled to summary judgment on Count I of the Complaint.[5]

**B.      Promissory Estoppel Claim**

To make out a claim for promissory estoppel, the aggrieved party must show by

---

[4] Although not necessary for the decision here, the Court notes that it also agrees with Defendant's contention that Plaintiff was on notice that Mr. McDevitt and Mr. Ortlieb did not have the authority to bind Wachovia to a lease agreement (the LOI stated unequivocally that the lease terms and a mutually agreeable lease were subject to Wachovia's real estate committee's review and approval) and that Wachovia required a fully executed lease agreement to be bound (there was clear language in the draft lease agreement limiting the parties to a binding contract only upon execution of a written lease agreement).

[5] Because the Court so finds, there is no need to reach the question of damages under the Statute of Frauds.

"clear, precise, and unequivocal evidence" that (I) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise. Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1319 (3d Cir. 1991); GMH Assoc's, Inc. v. The Prudential Realty Group, CB, 752 A.2d 889, 904 (Pa. Super. 2000). A plaintiff must have been induced to take some action or forbearance based upon the defendant's representation. Universal Computer Systems, Inc. v. Medical Services Ass'n. of Pa., 628 F.2d 820, 824 (3rd Cir. 1980). The action or forbearance must be of a definite and substantial character. Id. It is '[g]enerally ... invoked in situations where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing a promise." Carlson v. Arnot-Ogden Mem'l Hosp., 918 F.2d 411, 416 (3d Cir. 1990) Accordingly, it is "an equitable remedy to be implemented only when there is no contract; it is not designed to protect parties who do not adequately memorialize their contracts in writing." Iversen Baking Co. v. Weston Foods, Ltd., 874 F. Supp. 96, 102 (E.D. Pa. 1995).

Plaintiff's claim revolves around an alleged promise to "lease the pad site." Complaint ¶ 87. However, the undisputed record evidence explained above demonstrates that no such promise was made. What Wachovia did do was agree to negotiate a lease with WP 851 to lease a pad site in the future. There is no record evidence that Wachovia made any promises regarding those negotiations, and, indeed, Wachovia placed limitations on them such as the approval of the real estate committee. Plaintiff, therefore, cannot satisfy the first required element of a

10

promissory estoppel claim.  The lack of an appropriate promise ends the inquiry.[6]

Defendant is therefore entitled to summary judgment on Count III of the Complaint.

**V.      Conclusion**

The Court will grant Defendant's Motion for Summary Judgment.

---

[6] The second and third elements stem from an appropriate promise.  Any reliance (the second element) on a non-existent promise would be unreasonable.  Furthermore, there is no injustice to be avoided (third element) where there was no promise.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WP 851 ASSOCIATES, L.P., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 07-2374 |
| | : | |
| v. | : | |
| | : | |
| WACHOVIA BANK, N.A. | : | |
| | : | |
| Defendant. | : | |

**<u>ORDER</u>**

AND NOW, this 26th day of February, 2009, upon consideration of Defendant's Motion for Summary Judgment (Docket No. 30), Plaintiff's Response thereto (Docket No. 35), Defendant's Reply Brief (Docket No. 38), Plaintiff's Supplemental Memorandum of Law (Docket No. 47) and Defendant's Supplemental Memorandum of Law (Docket No. 48), it is hereby ORDERED that Defendant's Motion for Summary Judgment (Docket No. 30) is GRANTED and the case is DISMISSED.  The Clerk of Court shall mark the case closed for statistical purposes.

BY THE COURT:

/s/ C. Darnell Jones II

_____
C. DARNELL JONES II,      J.